GLADNEY, Judge.
This action in tort is one of two consolidated suits and arises from an auto *337 mobile accident which occurred about 2:40 P.M. on May 11, 1956, on Louisiana State Highway No. 15 about nine miles south of Monroe, within the Parish of Richland. Recovery of monetary damages by Henry Steadman is sought against Monroe Concrete Company, Inc., employer of Willie C. Viola, driver of one of its trucks, and the liability insurer of the truck, Manufacturers Casualty Insurance Company. The United States Fidelity and Guaranty Company, workmen’s compensation insurer of Fromherz Engineers, intervened in the suit and claims subrogation for sums paid under its policy to Steadman, who, at the time of the accident, was employed by its assured. After trial, judgment was rendered allowing recovery by Steadman and in-tervenor against the defendants, who have appealed. Appellee has answered the appeal, praying that the award granted by the trial judge be increased.
Steadman alleges for cause of action that he was traveling northwesterly toward Monroe and was making a proper passing movement of the truck of the Monroe Concrete Company, Inc., driven by Viola in the same direction when the latter swerved the truck into the left traffic lane, thereby causing the truck to strike and collide with the Steadman vehicle, a Ford. It is averred the Ford was pushed off the pavement out of control of Steadman which caused it to further collide with a Plymouth automobile driven by Preston B. Shivers; and that the .resulting personal injuries and property loss were occasioned by the negligence of Viola. Defendants deny Viola was in any wise negligent, deny the truck invaded the left passing lane, deny there was a collision between the two vehicles, and alternatively plead the contributory negligence of Steadman in several particulars.
The district court accepted the testimony of Henry Steadman that his automobile was struck and thrown out of control by the concrete truck, finding support therefor in the testimony of Viola that Henry Steadman made a statement immediately following the accident that the concrete truck driven by Viola had struck his automobile; that similar statements as to the cause of the accident were made by Stead-man to Warren N. Cawthorn, and the State Troopers who interviewed Steadman at the St. Francis Hospital; and in the testimony of Sgt. Jones, corroborated by Trooper Johns, that “he found physical evidence of collision and impact near high-line pole 338.” The court held the sole and proximate cause of .the accident was, inter alia, the negligence of Viola in driving at an excessive rate of speed, in failing to see the vehicle driven by Henry Steadman “under a superior right-of-way and alongside the concrete truck, and in failing after the collision or contact to bring the concrete truck under control and return it to its right lane of the highway.”
The trial judge pointed out in his reasons for judgment that a determination of whether or not there was any contact whatsoever between the concrete truck and Steadmans’ automobile is the most important point involved in this litigation. We fully agree with this statement for if the evidence supports ■& finding that the two vehicles came into contact with each other with the point of impact occurring in the left or passing lane, an affirmation of the position of the trial court is proper, but it is also true that in the absence of such a disclosure and finding a contrary decision would be indicated.
Many of the factual details are not controverted. The Plymouth driven by Shivers was preceding the truck by about seventy-five yards, traveling at about fifty miles per hour. The truck for two or three miles had followed the Plymouth, maintaining the same interval and speed. At a point about two hundred twenty-five feet east of the Bayou Lafourche Relief Bridge, Steadman commenced the maneuver of passing the concrete truck. The car went off the left side of the concrete slab and onto the shoulder'where it continued forward out of control of its driver until it neared the bridge when Steadman succeeded' in turn *338 ing to the right., The Ford struck the end of the concrete bench at the southeast corner of the bridge, and still out of control, overtook and collided with the car driven by Shivers. Both of these vehicles continued across the one hundred eighty-seven foot bridge and rolled down the south side of the high embankment. The Ford automobile was a total loss and Henry Steadman received serious personal injuries.
At the locus of the alleged point of impact of the Steadman automobile and the concrete truck the highway is constructed of a concrete slab nineteen feet in width. At a point ninety-eight feet east of the bridge the pavement gradually widens to conform to the full width of the paved surface of the bridge, which is twenty-six feet. The paved slab rests on the top of an elevated embankment approximately twenty feet above ground level. The shoulders of the highway are rather wide but slope perceptibly toward borrow pits .on either side. Steadman testified the dirt shoulder encountered by the wheels of his automobile was below the level of the concrete slab and was composed of sand and clay. On the Monroe side of the bridge the same conditions prevail as to the height and width of the road. From the point where Steadman testified his vehicle first left the pavement it is two hundred twenty-five feet from the nearest edge of the bridge. Approximately one hundred sixty-six feet from the same edge of the bridge is telephone pole 338, which was repeatedly referred to during the trial. After Stead-man began the passing movement his car moved two hundred twenty-five feet to the bridge, one hundred eighty-seven feet over the bridge and then continued a further distance of one hundred nine feet before rolling down the south side of the embankment, a total distance of five hundred twenty-one feet. At the time of the occurrence of the accident, the highway, including its shoulders, was dry with visibility excellent.
Besides the drivers of the Ford automobile and concrete truck, Alvin King was the only, other person in a position to have observed any contact between the two vehicles. King was driving a car following Steadman about thirteen hundred feet away when the passing movement was commenced. None of the occupants of the car being driven by Preston B. Shivers turned to look toward the rear until Steadman was nearer the bridge. Steadman gave this version of the accident:
“Q. And after you started your passing movement, go ahead and tell what happened. A. Well, I pulled over in the left lane, after I blowed my horn two or three times, and stepped on the gas and I was gradually gaining on him; I got up alongside of him and I checked — I was still moving too — I looked at my speedometer — it was bouncing 58 to 60 miles per hour. Just as I got about a foot and a half or two feet what I estimated to be the front end of my car, —up in front o.f his truck he suddenly cut over on me and hit me, and took me off the road.
?}i sjs % if: ^
“Q. Now, at the time that the truck cut over on you, tell us what happened. A.’ Well, when he cut over on me it was kinda crash, and I thought my car went sideways — the wheel jumped in my hand and I thought his rear end was going to hook into me; I thought .he knocked me to the extent to where his rear end would have hooked into me. And, but, I kept my foot on the accelerator — he cut over and took the left lane away from me. I stayed on the left shoulder of the road, then, and barely I outdistanced him enough to cut back on the highway just in front of him at the south end of the bridge.
* * * * * *
“Q. Now, what part of his automobile struck what part of your automo *339 bile? A. Well, it was his left front wheel.
“Q. And what part of your automobile was struck by him? A. Well, I told the highway officers, when they consulted me in the hospital, that he hit me somewhere between my door hinge and my right fender out toward front. But since then, examining it, he must have hit me back below the door hinges on the car. Because he got a twisted movement, shows on my door, as well as my right fender.”
Steadman further testified that after his left wheels edged over on the shoulder they followed a constant course more or less parallel to the edge of the concrete slab until he came within about twenty-five feet of the bridge when he was able to turn his car to the right, but the wheels of his car struck the edge of the concrete bench; that then the car continued forward and collided with the left rear portion of the Plymouth automobile; and that finally the two automobiles rolled down the left side of the embankment west of the bridge. When questioned as to when he saw the concrete truck on the wrong side of the road he testified he saw its whole left side from about the front part of the cab forward.
Willie C. Viola, the driver of the concrete truck, testified:
“ * * * A car came by me; when he got along beside me, he ran off the road — he immediately commenced trying to get back on the road. I immediately cut my truck to the right— took my foot off the accelerator which naturally reduced the speed slightly of the truck, applied the brake lightly and gently as I possibly could. My truck wheel dropped off. I immediately jerked it back upon the road and straightened the truck out. Mr. Stead-man’s car got back in the road and he swerved backwards and forth across the road and turned over. .
* ‡ ‡ . Jfc ‡
“ * * * As I turned my head I saw Mr. Steadman’s car below me and he ran off the road. I looked around and I saw a car running off the road, —now you can say he was on it or off it, that’s the way it was, sir.
‡ sjs ‡ sj<
“Q. About how many revolutions of the steering wheel would you have to make in order to cut the left front tire sharply enough to bring it out beyond the fender? A. Well, it’s largely —I know. Two and a half runs.
“Q. About two and a half revolutions of the steering wheel? A. Yes, sir.
“Q. What effect would that have on your truck, if you’re driving say forty or forty-five miles an hour? A. Well, to make two complete revolutions, driving that fast, no faster than a person can work his hands, he would have to quite a distance. By the time he got it completely made, far enough for the tire to extend beyond the fender, he would have to go in the ditch on the other side of the road.”
Viola denied he moved to the left from his proper lane.of travel and declares there was no contact between the two automobiles. He testified he did not hear a horn. Following the collision between the Ford and Plymouth automobiles he drove his truck across the bridge and stopped on the right or north shoulder, helped in the removal of Mr. Parker, an injured occupant of the Plymouth car and assisted in directing traffic until the officers arrived.
Alvin King testified that he could not say whether the concrete truck and the Stead-man automobile touched, but he repeatedly stated that he never did see the concrete truck move over across the center line or leave its proper lane and the truck was still on the- right side of the road when the Ford got back on the pavement.
Important circumstantial evidence was tendered on behalf of both sides. Plaintiff *340 .supported his version of the accident by offering three pieces of chrome metal on the theory it was knocked from the Ford automobile upon its impact with the concrete truck. Also submitted were two sections of the body of the right side of the Ford upon which there were marks which reputedly were made by the left front tire of the concrete truck. There was uncontro-verted testimony relating to tire marks found upon the left shoulder of the highway within two hundred twenty-five feet of the east end of the bridge. Also Stead-man, his son and Warren N. Cawthorn testified as to the presence of skid marks described as from dual wheels on the concrete pavement near the south end' of the bridge. Sgt. J. V. Jones testified as to finding physical evidence of an impact between the two vehicles opposite telephone pole 338, but this physical evidence was not otherwise identified, the State Trooper simply stating he could not remember of what it consisted. The only circumstantial evidence favoring the defendants was the undisputed fact there was not a single blemish or scratch on the left front fender and left front tire of the concrete truck. There can be no room for doubt as to this fact for the truck was thoroughly examined by the same two State Troopers who investigated the accident immediately after they were informed by Mr. Steadman at the hospital that a collision had occurred between the truck and the Ford automobile.
The record is impregnated with many conflicting statements by witnesses and contradictory evidence. Many of the controversial points raised by counsel concerned matters which at the time referred to may have seemed irrelevant or unimportant and failed to impress the person who was later called to the witness stand. Thus, we find contradictory testimony between Viola and the officers who investigated the accident, between Steadman and the same officers, between Steadman and Cawthorn, and between Viola and Rankin Earle. Typical of these instances is the inquiry as to the location of Viola’s truck following its stop on the highway after the accident. The two officers, Jones and Johns, placed it on the Monroe side of the bridge south of the highway. Viola and Steadman said the truck was parked on the Monroe side of the bridge on the north side of the highway. Rankin Earle positioned the vehicle on the Winnsboro side of the highway on the north shoulder. Another puzzling issue relates to skid marks. Cawthorn, Henry Steadman, Jr. and plaintiff said they found dark black tire marks from dual wheels plainly visible near the south end of the bridge, yet the two officers who examined the same portion of the highway looking for evidence on the two separate occasions on the day of the accident, did not observe these tire marks. Still another such item appears from the testimony of Sgt. Jones as to the finding of physical evidence of an impact on the paved slab, the nature of which he could not remember, but which he considered determined the locus of a collision between the truck and Ford automobile. The point was located by him as being opposite pole 338, but this is fifty-nine feet distant from where Steadman said the collision between the two vehicles took place.
A detailed examination of witnesses was made with reference to the finding of pieces of chrome near the spot where the passing maneuver was commenced. A single piece of the chrome was found the day after the accident according to Cawthorn and Henry Steadman, Jr. Plaintiff testified it was found on May 21st at a point two hundred twenty-seven feet east of the bridge. He later testified that he himself found two pieces of chrome which he fished out of the borrow pit sometime during the month of November, 1956, about two hundred fifty-seven feet east of the bridge. It seems not unlikely that as a consequence of the Ford striking the bridge abutment and then colliding with the Plymouth automobile, glass and metal parts were torn from the two vehicles and scattered upon the highway, and with the passage of traffic and individuals, it is not unlikely that such articles were moved from the place where they were initially deposited.
*341 Plaintiffs theorize that the colored indentation made on the right side of the Ford came as a result of contact with the tread of the left front wheel of the concrete truck. Henry Steadman, Jr. described these marks as follows:
“They are semi-circular bluish marks —the type you would ordinarily find where anything had been rubbed by ■very dark rubber — standing apart, I believe, they came about 34, 35, or 36 inches — something like that, from the ground up to the side of the panel and ,the door of the car.”
Trooper Johns also inspected the right ■side of the Ford. He was asked as to what markings he saw, and answered:
“A. Well, it’s come in contact with ■something. That’s all. I don’t have .any idea what kind of markings you’d ■call them.
“Q. Well, just what do they appear ? A. Well, I couldn’t say, I wouldn’t. There are a lot of things that could make a marking like that, .1 believe.”
'Counsel for appellees argue the speed of the concrete truck was excessive and constituted an act of negligence by Viola. Conceding, arguendo, this postulation, it is quite plain, however, that the speed of either vehicle was not an important factor in the determination of liability, and cannot be considered as a proximate cause thereof.
After having carefully weighed all of the evidence we are convinced there was no actual contact between the car and the truck. Certainly, in our opinion, such a fact has not been shown by a preponderance of the testimony. In arriving at this conclusion we have been impressed by the uncontro-verted fact that the left fender of the truck was unscratched. It is true Stead-man testified the wheel and tire alone •touched the Ford, but manifestly he was not in a position to see what part of the truck •came in contact with the right portion of •.the Ford’s body. Furthermore, testimony of Viola, which is not disputed, indicates that if he had turned the wheel to ■ the left so as to extend the forward edge of the tire beyond the fender, a more disastrous type of collision would have followed. These points appear to us to be unanswerable and in consequence we have concluded that plaintiff has failed to prove his case to a legal certainty. We find Viola was not guilty of any act of negligence from which a proximate cause of the accident may be inferred.
It follows, therefore, for the reasons hereinabove set forth, that the judgment from which appealed should be reversed, annulled and set aside, and plaintiff’s demands and the demands of intervenor are rejected with costs.